1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   GERALD A. ENGLER
    Senior Assistant Attorney General
4   JULIET B. HALEY
    Deputy Attorney General
5   DORIAN JUNG
    Deputy Attorney General
6   State Bar No. 200116
        455 Golden Gate Avenue, Suite 11000
7       San Francisco, CA 94102-7004
        Telephone: (415) 703-1342
8   Fax: (415) 703-1234
        Email: dorian.jung@doj.ca.gov
9   Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14  **JAMES E. TOPPER,**                    C 07-4543 JSW (PR)

                                Petitioner,

15

            **v.**

16

    **M.S. EVANS, Warden,**

17

                                Respondent.

18

19  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER TO**
20  **PETITION FOR WRIT OF HABEAS CORPUS**

21

22

23

24

25

26

27

28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  JULIET B. HALEY
   Deputy Attorney General
5  DORIAN JUNG
   Deputy Attorney General
6  State Bar No. 200116
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-1342
8  Fax: (415) 703-1234
     Email: dorian.jung@doj.ca.gov
9  Attorneys for Respondent

10

11                 IN THE UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                        SAN FRANCISCO DIVISION

14  **JAMES E. TOPPER,**                          C 07-4543 JSW (PR)

15                              Petitioner,        **MEMORANDUM OF POINTS
                                                   AND AUTHORITIES IN
16        **v.**                                   SUPPORT OF ANSWER TO
                                                   PETITION FOR WRIT OF
17  **M.S. EVANS, Warden,**                        HABEAS CORPUS**

18                              Respondent.

19

20                        **STATEMENT OF THE CASE**

21          On November 8, 2004, the District Attorney of Alameda County filed a fifteen count

22  information against petitioner James Edward Topper.  CT 240.[1/]  As to victim Sandee, the

23  information charged five counts of forcible oral copulation (Cal. Penal Code § 288a(c)(2)) (counts

24  1, 3, 5, 9, and 12), six counts of forcible rape (Cal. Penal Code § 261(a)(2)) (counts 2, 4, 6, 10, 11,

25  and 13), and one count each of forcible sodomy (Cal. Penal Code § 286(c)(2)) (count 14) and child

26  _____

27          1.  "CT" denotes the Clerk's Transcript on Appeal, lodged with the answer as Exh. A.  "RT"
    denotes the Reporter's Transcript of Trial Proceedings, lodged with the answer as Exh. B.
28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

1

1   endangerment (Cal. Penal Code § 273a(a)) (count 15).[2]  As to victim Jennifer, the information

2   charged one count each of forcible oral copulation (Cal. Penal Code, § 288a, subd. (c)(2)) (count 7),

3   and forcible rape (Cal. Penal Code § 261(a)(2)) (count 8).  CT 240-54.

4        The information specially alleged that the first fourteen counts were serious felonies

5   within the meaning of Cal. Penal Code § 1192.7(c), and were violent felonies within the meaning

6   of Cal. Penal Code § 667.5(c). CT 240-53.  In connection with counts 5, 6, 7, and 8, the information

7   further alleged that petitioner had committed an offense specified in Cal. Penal Code § 667.61(c),

8   against more than one victim, within the meaning of § 667.61(e)(5).  CT 244-47.

9        On February 7, 2005, a jury convicted petitioner on the fourteen remaining counts of the

10  information.  CT 510-23.

11       On May 11, 2005, petitioner appeared for sentencing.  CT 562.  Pursuant to the "One

12  Strike" law (Cal. Penal Code § 667.61), the court imposed the total indeterminate prison term of 70

13  years to life.  CT 562, 567.

14       Petitioner appealed.  CT 567.  On June 26, 2006, the California Court of Appeal affirmed

15  petitioner's conviction.  Exh. F.

16       On August 2, 2006, petitioner filed a petition for review.  Exh. G.  On September 13,

17  2006, the California Supreme Court issued an order denying the petition.  Exh. H.

18       On August 31, 2007, petitioner filed the instant petition pursuant to 28 U.S.C. § 2254.

19

20                        **STATEMENT OF FACTS**

21       Respondent takes the following statement of facts from the opinion of the California Court

22  of Appeal:

23                             *Background*

24  Sandee and Jennifer's father died of a heart attack in April of 1998, when the family was
    living in Illinois.  Sandee was 12.  Jennifer was 14.  The girls' mother, Terri, did not react

25  well to her husband's death.  She was "absolutely devastated."  She moved the family to
    Valdosta, Georgia, to be closer to her family.  She would lock herself in her room and

26

27

28       2.   This charge was dismissed before trial on the People's motion.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

2

spend a lot of time "chatting" on the Internet. According to Sandee, Terri "seemed really kind of to go off the deep end."

Within two weeks Terri met defendant on the Internet. Defendant called himself "Jet 767" and claimed he was a pilot for Delta Airlines. He also claimed to own a plane, houses in West Virginia and Hawaii, and a red Jaguar. He passed himself off as a widower, but Terri was later to learn that defendant's wife was alive and living in Colorado. Terri communicated regularly with defendant and shared personal information. She told defendant about her husband's recent death and her two young daughters. She also told defendant that as a result of her husband's death she was receiving regular Social Security payments.

In October 1998, Terri drove with her son Shawn to Fairmont, West Virginia, and met defendant at a McDonald's. Terri and defendant were married that weekend. Terri and Shawn returned to Valdosta, while defendant stayed in Fairmont. After Thanksgiving, Shawn and 12-year-old Sandee were sent to Fairmont to live with defendant. Terri and Jennifer stayed behind in Valdosta.

Sandee did not like living with defendant without her mother. Defendant was "a complete stranger to me." Within a couple of weeks after her arrival, defendant began to molest her. Once, she fell asleep and awoke to find defendant's hands inside her shirt. On another occasion Sandee swallowed a button, and defendant made her lift up her shirt so he could "feel around on my chest to check to see if he could feel the button." On yet another occasion Sandee awoke to find defendant touching her on her chest and between her legs. Sandee was scared and didn't understand what was going on.

After Christmas Jennifer was sent to join her sister and defendant in Fairmont. Terri stayed behind in Valdosta with defendant's daughter, Amanda. Defendant stopped molesting Sandee, who was now 13, but started molesting 15-year-old Jennifer. One night when it was snowing defendant asked Jennifer if she wanted to cuddle on the couch, telling her it would be warmer. Defendant began touching Jennifer in the abdomen and the vaginal area, then penetrated her vagina with his hand. Then defendant penetrated Jennifer's vagina with his penis. Jennifer pretended to be asleep, hoping that defendant would stop.

Terri moved to Fairmont in February 1999 and rejoined the family. Defendant sexually assaulted Jennifer between 10 and 20 times over the next several months. The assaults included intercourse and oral copulation.

On one occasion, Jennifer told defendant she did not like what he was doing to her. Defendant became angry, grabbed her hand, placed it on his penis and pushed her head toward her hand. Jennifer understood that defendant wanted her to orally copulate him. She did, but did not want to do so. Defendant told Jennifer not to tell Terri about the sexual assaults. He threatened to send her to a reform school, which would jeopardize Jennifer's hopes to join the military. Defendant's reform school threat weighed on Jennifer's mind and affected her judgment and her "thoughts about things defendant was doing to" her.

As Jennifer got to know defendant while living with him in Fairmont, she concluded that he "learned the habits and weaknesses" of Terri, Jennifer, Sandee, and Shawn. He "was very quick to judge and had a quick temper." Meanwhile Terri began to have misgivings about defendant. "I came to realize that he was not the person that he led me to believe he was. If you didn't do what he wanted you to do, you suffered. He used threats, manipulation and was controlling."

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

3

Defendant called Sandee and Jennifer names and belittled them, and forced them to stand holding a dime against a wall with their nose. He treated the two girls "like they were dogs." Terri tried to get defendant to stop the mistreatment, but to no avail: defendant said "when he spoke we had to listen and if we didn't we wouldn't like him very much." He made Terri open a bank account for the Social Security payments she received for her husband's death, and defendant took control of the account.

In June 1999, the family moved to Parkersburg, West Virginia. Defendant continued to sexually molest Sandee and Jennifer. Defendant told Sandee not to tell anyone, or she would be sent away. That scared Sandee because "I had never been away from my family before except for staying at people's houses. . . . I had already lost my dad. I didn't want to lose the rest of my family as well." Jennifer found that resisting defendant was not useful—defendant would become angry and mean. "It was always easier to just go along than put up a fight and argue."

In August, Jennifer told Terri about the molestations. Terri confronted defendant, who became angry and denied molesting Jennifer Defendant told Terri he would take Jennifer for a ride and make a tape recording of her denying any sexual assault. Defendant ordered Jennifer to pack all her clothes in garbage bags, leading her to believe she was being taken away "for good," and took her on a five-hour drive.

During the drive, defendant asked Jennifer what she was trying to accomplish. He accused her of lying and told her she would be "locked up" in a reform school and be unable to join the military. She begged him "not to take me," and defendant asked what was in it for him. Jennifer took this as a "signal to me . . . that he wanted . . . sexual favors in exchange for . . . me to go home." She was crying, and was afraid of being put in a mental institution and excluded from military service. She orally copulated defendant, again without wanting to.

Back at the house, defendant played a tape recording for Terri. She heard Jennifer begging defendant not to send her away, and promising to do anything for him—including oral copulation and having sex on the hood of the car. Jennifer later told Terri that she had lied about defendant's molesting her. But defendant continued to sexually molest Jennifer.

In January 2000, the family moved to Scottsdale, Arizona. Defendant continued to molest Jennifer. Defendant continued to molest Sandee, escalating to intercourse and oral copulation. Defendant became enraged when Sandee kissed the family puppy. He pulled her by the hair and threw her into a wall. He slammed Shawn to the floor when he tried to intervene. Defendant also tried to sever the relationship between Sandee and Terri. Defendant and Terri had a fight, which culminated in defendant telling Terri that "if you fuck with me, there's not a safe place on earth for you."

In January 2001, the family moved to Mesa, Arizona. In April, Jennifer joined the Army. Defendant continued to rape Sandee and force her to engage in oral copulation. He would threaten to send her away if she told anyone. Sandee was scared and "whether I fought or didn't fight, he was going to get his way. So it was just easier for me to just let it happen and get it over with." Sandee knew that defendant had sent Shawn away to a reform school in Mexico because he refused to paint the garage door.

In October 2001, the family moved to Logandale, Nevada. Jennifer was still in the Army. Defendant continued to rape Sandee and force her to orally copulate him. He also forced

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

4

her to engage in anal sex.  When she tried to pull away, defendant forcibly pulled her back.

*The Charged Offenses*

In April 2002, defendant came under the criminal jurisdiction of California when the family moved to Livermore.  Jennifer had rejoined the family after a medical discharge from the Army.  Sandee was 16 and a freshman in high school.

Based on conduct occurring between April 1, 2002, and February 24, 2003, defendant was convicted of 14 felony sex offenses—12 involving Sandee (Counts 1-6 and 9-14) and two involving Jennifer (Counts 7 and 8).  We summarize the facts underlying those convictions.

*Sandee*

Sandee testified that defendant exercised complete control over her.  He would tell her "where to go, what to do, what to say at times.  I didn't have control over anything I wanted."  Sandee had to come home for lunch during the school day, and defendant took her to the premises of his sign business when the school day ended.  Sandee could not go out on weekends, talk on the phone, or have friends over.  She rarely used the computer.  If she disobeyed defendant, he would become angry and "lash out" at her.  Sandee was always afraid defendant would hurt her or send her away, or hurt Terri—defendant had thrown a lit cigarette in Terri's face while the family lived in Parkersburg.

Count 3—forcible oral copulation (§ 288a, subd. (c)(2))

Count 4—forcible rape (§ 261, subd. (a)(2))

Before she left for high school in the mornings, Sandee would usually take defendant his coffee.  He occasionally would ask her for a "quickie before school."  Sandee testified about one specific occasion, in defendant's bedroom, where defendant forcibly orally copulated her and then raped her.  Sandee submitted because she was scared of defendant and was afraid he would injure her or send her away, separating her from Terri.

Count 1—forcible oral copulation (§ 288a, subd. (c)(2))

Count 2—forcible rape (§ 261, subd. (a)(2))

Counts 9 & 10—forcible oral copulation (§ 288a, subd. (c)(2))

Count 11—forcible rape (§ 261, subd. (a)(2))

Defendant raped and forcibly orally copulated Sandee during her driving lessons.  He apparently would first force the copulation and then commit rape.  Sandee testified to two specific occasions of forcible sex in defendant's car, but said forcible sex happened "a lot."  She was scared and afraid of being sent away.  She felt "like a robot, like his little toy."  She endured the forcible sex because she "couldn't bear to be separated" from her mother.

On another occasion, defendant took Sandee to the premises of a friend's business, where he forcibly orally copulated and then raped her.

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

5

1  Sandee testified that while the family lived in Livermore defendant raped her or forced
   her to orally copulate him "one to two times a day." Sandee was "robotic . . . It was like
2  programmed, I knew what to do. Then when he would be raping me, it was just like I was
   just a numb statue, like I was paralyzed. I wouldn't move . . . I would just lay there."

3

4  Defendant would complain about Sandee's failure to show emotion during the forcible sex
   acts: "He would tell me, what's wrong with me, are you a lesbian, why aren't you acting
   like you're enjoying this." If she wasn't responsive defendant would pinch her on the arm
5  and hit her on the legs, enough to hurt but not enough to leave marks.

6             Counts 12 & 13—forcible oral copulation (§ 288a, subd. (c)(2))

7               Count 14—forcible sodomy (§ 286, subd. (c)(2))

8  Defendant forced Sandee to submit to sex acts more than 20 times on the premises of his
   sign business. Sandee testified to one specific occasion where defendant forced Sandee
9  to orally copulate him, raped her, and forcibly sodomized her in the back of a van parked
   in the garage of the premises.

10

11                            *Sandee and Jennifer*

12 In addition to the abuse of Sandee summarized above, defendant continued to sexually
   molest Jennifer after she returned from the Army and the family lived in Livermore. This
   included uncharged acts of sexual intercourse and forcible oral copulation. Defendant was
13 convicted of forcible oral copulation and forcible rape of both Sandee and Jennifer, based
   on the incident we now describe.

14

15          Count 5—forcible oral copulation (§ 288a, subd. (c)(2))(S.)

16             Count 6—forcible rape (§ 261, subd. (a)(2))(S.)

17          Count 7—forcible oral copulation (§ 288a, subd. (c)(2))(J.)

18             Count 8-forcible rape (§ 261, subd. (a)(2))(J.)

19 On a day when Terri was out of town, defendant told Sandee that Jennifer had seen them
   engaging in sex acts, and that defendant and Sandee had to trick Jennifer into performing
20 a sex act with the two of them "so she wouldn't be able to tell Terri what was going on."
   Defendant told Sandee to "do what you do," which Sandee took to mean that she would
   be forced to perform oral copulation on defendant and then be raped.
21

22 Defendant then went to Jennifer and told her that Sandee had seen them engaging in
   sexual activity, and that "the only way to keep Sandee from saying something to Terri was
   to get all of us, the three of us total involved."
23

24 Defendant called Sandee and Jennifer to his bedroom and had them disrobe and get into
   bed. The three laughed and wrestled playfully, but then "it all of a sudden got really
25 serious." Defendant laid back on the bed and told Jennifer to sit next to him. Pursuant
   to the earlier command of "do what you do," Sandee began to perform oral sex on
   defendant. Defendant told Jennifer to lick his nipples, which she did. Defendant then
26 placed Sandee on her knees and raped her. During the rape defendant had Jennifer stand
   behind him and lick his testicles. Defendant put Sandee on her back and raped her again.
27 At some point defendant forced Jennifer to orally copulate him.

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

6

Defendant ordered Sandee and Jennifer to get on all fours at the edge of the bed. The two girls knelt side-by-side. Defendant raped Jennifer, who stared down at the bedclothes and showed no emotion. Sandee touched her hand but she did not respond. Jennifer "just wanted the sex acts to stop." Defendant then raped Sandee.

Defendant sent Jennifer to the store for food. After she left, defendant told Sandee that Jennifer "wasn't good enough, so let me finish off with you." Defendant raped Sandee again.

*Aftermath*

After admitting the sexual abuse to school counselor, Sandee was removed from defendant's home. When police investigated, Jennifer denied she had been sexually molested by defendant. But defendant continued to sexually abuse her. Eventually Jennifer established a romantic relationship with a man she met on the Internet, and left to live with him in Australia without defendant's or Terri's knowledge. She then felt safe enough to reveal the sexual abuse to po
lice.

Defendant's response to Jennifer's revelation was this e-mail:

"Teri [*sic*] has only one daughter. You aren't it. She is putting your ass in jail. You will find out she wasn't joking shortly. She hates your fucking guts. You think you can leave Australia and get back in in three months. Doesn't even matter if you're married to the fucking loser, you won't get back in. Your ex-Mom took care of that. You are dead. Don't ever contact us again. You have no family, not Teri [*sic*], not Amanda, not Sean [*sic*]. You are dead to all of us. Do not contact us again. Whore. She has had her phone numbers changed so you—she's had her phone number changed so you doesn't [*sic*] hear your disgusting voice. She has blocked you from her mailbox. Don't make this mistake again. Ever. Ever. Ever, you disgusting piece of shit."

Exh. F at 1-9 (internal edit marks and footnotes omitted).

**STANDARD OF REVIEW**

Habeas corpus review in this case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), by which "Congress placed a new restriction on the power of the federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Chapter 153 of the AEDPA, which governs the present case, prohibits relief on federal constitutional claims unless the state ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

7

1    "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

2    arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court

3    decides a case differently than this Court has on a set of materially indistinguishable facts.  Under

4    the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court

5    identifies the correct governing legal principle from this Court's decisions but unreasonably applies

6    that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 412-13.  The test is

7    objective, and an unreasonable application is not merely incorrect or erroneous.  *Id.* at 410-11.  A

8    "federal habeas court may not issue the writ simply because that court concludes in its independent

9    judgment that the relevant state-court decision applied clearly established federal law erroneously

10    or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

11    "It is not enough that a federal habeas court, in its independent review of the legal question

12    is left with a firm conviction that the state court was 'erroneous.'"  *Lockyer v. Andrade*, 538 U.S.

13    63, 75 (2003) (internal citation and edits omitted).  Even a showing of "clear error" falls short of the

14    established standard of objective unreasonability.  *Id.* at 75.  Where the state court denies relief

15    without a reasoned opinion, the federal habeas court does not review the claim de novo, but does

16    "perform an 'independent review of the record' to ascertain whether the state court decision was

17    objectively unreasonable."  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  Also, state court

18    factual determinations are presumed correct unless rebutted by clear and convincing evidence.  28

19    U.S.C. § 2254(e)(1).  The petitioner bears the burden of showing that the state court's decision was

20    unreasonable.  *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

21    Even if the state court's ruling is contrary to or an unreasonable application of Supreme

22    Court precedent, that error justifies overturning the conviction only if the error had a "substantial

23    and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S.

24    619, 637 (1993).  The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless

25    error review conducted by the state courts.  *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007).

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

1

# ARGUMENT

2

## THE STATE APPELLATE COURT DID NOT UNREASONABLY APPLY CLEARLY ESTABLISHED FEDERAL LAW BY REJECTING PETITIONER'S CLAIM THAT INSUFFICIENT EVIDENCE SUPPORTED HIS CONVICTIONS IN COUNTS 7 AND 8

3

4

5         Petitioner contends that the state appellate court unreasonably denied relief on his claim

6   that there was no evidence of duress to support his convictions on counts 7 and 8. Petn. at 15. He

7   argues that there was evidence of only one threat against victim Jennifer, and that it had ceased to

8   exist before petitioner committed the charged offenses. Petn. at 16-18.

9         The state appellate court did not unreasonably apply clearly established federal law by

10  rejecting petitioner's claim:

11        Defendant contends there is insufficient evidence to support the rape and forcible oral
          copulation involving Jennifer charged in Counts 7 and 8. We disagree because there is
12        sufficient evidence to support the People's theory of those charges—that Jennifer
          submitted to defendant's sexual demands due to duress.

13
          The information alleged that the rape and forcible oral copulation charged in Counts 7 and
14        8—like the related crimes involving Sandee charged in Counts 5 and 6—were committed,
          in the language of the pertinent statutes, "against [the] victim's will by force, violence,
15        duress, menace, and fear of immediate and unlawful bodily injury . . . ." (§§ 261, subd.
          (a)(2), 288a, subd. (c)(2).)

16
          At closing argument, the People took the position that the counts involving Sandee were
17        based on theories of force and fear of bodily injury, but that the two counts involving
          Jennifer were based on a theory of duress. Specifically, the prosecutor mentioned
18        Jennifer's fear of being sent away and disowned by her mother. The prosecutor also
          referred to defendant's scheme to require Jennifer to have sex with him in Sandee's
19        presence—the incident underlying Counts 5 through 8—in order to prevent Sandee from
          telling Terri she supposedly saw defendant and Jennifer having sex. As the prosecutor
20        summarized his argument: "So we have something over their head. Always had
          something hanging over Jennifer's head. That's duress. Retribution, implied, direct or
21        implied threat of retribution. Retribution is what? It's punishment, it's payback."

22        We review the sufficiency of the evidence on Counts 7 and 8 by well-established
          principles. The standard of review of the sufficiency of the evidence to support a criminal
23        conviction is well known. (See *People v. Mincey* (1992) 2 Cal.4th 408, 432 (*Mincey* ).)
          The sole function of the appellate court is to consider the evidence in the light most
24        favorable to the judgment, presume in support of the judgment every fact that can be
          reasonably deduced from the evidence, and "determine . . . whether a reasonable trier of
25        fact could have found that the prosecution sustained its burden of proof beyond a
          reasonable doubt." (*Mincey*, *supra*, at p. 432; see *People v. Jones* (1990) 51 Cal.3d 294,
26        314.) The evidence must be "reasonable, credible, and of solid value." (*People v.
          Johnson* (1980) 26 Cal.3d 557, 578.)

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

9

We first discuss Count 8. The rape statute defines duress as "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." (§ 261, subd. (b).) The statute further provides that "[t]he total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b); see *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51 (*Pitmon*).)

"[D]uress involves psychological coercion. [Citation.] Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. [Citations.]" ( *People v. Senior* (1992) 3 Cal.App.4th 765, 775 (*Senior*).) "'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of duress." (*Senior*, *supra*, 3 Cal.App.4th at p. 775, quoting *People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 239.) And when sex acts are committed on a child by a parental authority figure "against a background of . . . violence, . . . the circumstances [may] suggest[ ] an implied threat of harm" if the victim fails to submit. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1580.)

Defendant contends that the only specific threat to which Jennifer testified was the threat to place her in reform school and thereby endanger her anticipated military career. He correctly points out that defendant made this threat before the family moved to California, and that this threat was essentially moot by the time the Count 8 rape occurred because Jennifer had already entered, and been discharged from, the Army.

We cannot view the evidence so narrowly. Defendant ignores the substantial evidence of the environment he created and maintained for his stepchildren. This was an environment of fear, intimidation, the use of physical force, and psychological terror. Defendant exerted almost complete control over the household. He abused his wife, his stepdaughters, and his stepson. He was physically and verbally violent. He entered his stepdaughters' lives when they were psychologically vulnerable and exploited their vulnerability by creating and maintaining a constant fear of their being sent away from their mother. And Jennifer's testimony, corroborated by Sandee's, shows that defendant intimidated Jennifer into submitting to sex acts with him and Sandee in the guise of preventing disclosure of the illegal sex acts to Terri—an obvious threat to the stability of the family unit.

The jury was entitled to view Jennifer's submission to defendant under counts 7 and 8 through the history of past control and coercion as well as what transpired on that day.

Under such circumstances, and the unmistakable pattern of defendant's persistently egregious coercive behavior, the jury could reasonably conclude that defendant exerted psychological coercion to get Jennifer to submit to the rape charged in Count 8. (See *People v. Leal* (2004) 33 Cal.4th 999, 1010 (*Leal*); *Senior*, *supra*, 3 Cal.App.4th at pp. 775-776.) Certainly defendant caused Jennifer to submit to rape by an implied threat of force, violence or danger, or at the very least the retribution of her being sent away from home or seeing her family broken apart by Terri's learning about the sex acts.

The foregoing reasoning applies with equal force to the oral copulation charged in Count 7. In addition, duress under section 288a is more broadly defined to include a direct or implied threat of "hardship." (*Senior*, *supra*, 3 Cal.App.4th at p. 775; see *Leal*, *supra*, 33 Cal.4th at pp. 1004-1010; *Pitmon*, *supra*, 170 Cal.App.3d at p. 50.) "Hardship" has been interpreted liberally to include a threat to place a child "on restriction" if she did not orally

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

10

1
2
3

copulate and have sex with her stepfather.  (*People v. Bergschneider* (1989) 211 Cal.App.3d 144, 150, fn. 3, 154, disapproved on unrelated grounds in *People v. Griffin* (2004) 33 Cal.4th 1015, 1028; see *Leal, supra*, 33 Cal.4th at pp. 1009-1010.)  The consequences of Jennifer's not submitting to defendant would clearly fall within the scope of the term "hardship."

4
5

There is substantial evidence to support Counts 7 and 8.  Thus, the basis for defendant's life sentence under section 667.61, subdivision (e)(5), remains intact.

6

Exh. F at 9-12 (internal footnotes omitted).

7
8
9
10
11
12
13
14

The principles underlying an insufficient evidence claim are well established.  The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  A federal habeas court must presume that the trier of fact resolved any conflicts in the evidence in favor of the prosecution and defer to that resolution.  *Id.* at 326; *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  Under the AEDPA, the question is whether the state court reasonably applied *Jackson*.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

15
16
17
18
19
20
21
22
23

Viewing the evidence in the light most favorable to the judgment, a reasonable trier of fact could have found the duress element of the disputed rape offenses to be proven beyond a reasonable doutbt.  Simply put, petitioner used his position of authority, as well as Jennifer's dependence as a stepchild, to physically and psychologically terrorize her until she submitted to his sexual assaults.  Petitioner became Jennifer's stepfather just after she reached her 15th birthday.  RT 271-72, 392.  She was young and vulnerable, having just lost her own father.  She went to live with petitioner three months later, and petitioner began sexually abusing her within weeks of her arrival.  RT 399-402.  Petitioner took advantage of a position of authority and dominance that was magnified by Jennifer's recent loss of her own father and the absence of Jennifer's mother in the home.

24
25
26
27
28

Petitioner's dominance was both psychological and physical.  When Jennifer told petitioner she did not want to perform these acts, petitioner used his physical advantage to force Jennifer to submit to his sexual assaults.  Petitioner became angry, grabbed her hand, and placed it on his penis.  RT 406.  With his other hand, he grabbed her head and also forced it to his penis.  RT

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

11

406. Before Jennifer's mother arrived, Jennifer estimated that petitioner forced her to perform acts of sexual intercourse and oral copulation between 10 and 20 times. RT 88, 404. He threatened Jennifer that if she were to tell anyone, she would be sent away to reform school, that she would upset her mother, and that the military would be uninterested in anyone with such a history. RT 408. This sexual abuse had persisted for more than four years when the acts alleged in counts 7 and 8 occurred. RT 430, 438-39. Although the offenses alleged in counts 7 and 8 took place when Jennifer was on or about her nineteenth birthday, petitioner remained in a position of authority and dominance in the home. Moreover, it was reasonable for the jury to infer that petitioner continued to leverage his early domination to continue to force Jennifer to perform acts that she would otherwise have refused.

Petitioner terrorized his wife and stepdaughters. The victims' mother, Terri, testified that "[i]f you didn't do what he wanted you to do, you suffered" and that "you didn't dare go against him." RT 274, 285, 289-90. Petitioner was controlling and used threats and manipulation. RT 274. Petitioner told Terri, "If you fuck with me, there's not a safe place on earth for you." RT 277. Jennifer testified that petitioner would "make you miserable" if he did not get his way. RT 476. Petitioner's threats were never idle. When Jennifer told her mother about petitioner's abuse, petitioner made Jennifer pack her belongings and then drove Jennifer away from their home. RT 280. Petitioner forced Jennifer to recant and perform oral copulation by threatening to remove her from the home and send her to reform school. RT 417. Petitioner also threatened Sandee that if she told, she would be sent away. Petitioner arranged to have Jennifer's brother, Shawn, removed from the home and sent to a reform institution in Mexico when the boy refused to paint the garage door. RT 291-92. When Jennifer's mother went to Mexico to pick him up, petitioner refused to allow Vander Linde to bring Shawn home. RT 292. When Jennifer did leave petitioner, petitioner sent angry e-mails telling Jennifer she was dead, that her mother hated her, that she could never return, and that she had no family. RT 448-51. He also accused her of stealing from his business. RT 450.

Jennifer's fear was so great, and petitioner's dominance so complete, that Jennifer repeatedly denied petitioner's sexual assaults until she had escaped not to another city or even state,

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

12

1    but to another continent.  In light of this evidence, a jury could reasonably find that petitioner's

2    repeated acts of retribution and revenge against Jennifer and her family were psychologically

3    coercive.

4           Petitioner threatened removal from the home and ostracism directly, but petitioner also

5    forced Jennifer to engage in the charged acts through an implied threat of violence.  If petitioner was

6    unhappy, he could become dangerous.  Jennifer watched petitioner drag Sandee down a flight of

7    stairs, then strike her repeatedly, then beat Shawn.  RT 291-92, 463.  This background of violence

8    provided substantially supported a finding that petitioner forced Jennifer to perform the acts of oral

9    copulation and intercourse through an implied threat of physical harm.

10           In sum, petitioner was Jennifer's stepfather and he had a position of authority over her.

11    Jennifer was fifteen years old when the abuse began, and her father had recently died.  Petitioner's

12    abuse continued for more than four years.  He was physically abusive, psychologically domineering,

13    and relentlessly vindictive.  Jennifer lived under a constant threat of physical harm, psychological

14    warfare, and retribution if she did not submit to petitioner's sexual predations.  In light of this

15    overwhelming evidence, the state appellate court did not violate clearly established federal law by

16    finding that substantial evidence supported petitioner's convictions of rape by duress.  Petitioner's

17    claim for habeas relief accordingly fails under the AEDPA.

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

13

1

**CONCLUSION**

2

For the foregoing reasons, respondent respectfully requests that the order to show cause

3

be discharged, and the petition be denied.

4

Dated:  April 9, 2008

5

Respectfully submitted,

6

EDMUND G. BROWN JR.
Attorney General of the State of California

7

DANE R. GILLETTE
Chief Assistant Attorney General

8

9

GERALD A. ENGLER
Senior Assistant Attorney General

10

JULIET B. HALEY
Deputy Attorney General

11

12

/s/ Dorian Jung
DORIAN JUNG
Deputy Attorney General

13

Attorneys for Respondent

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

1

# TABLE OF CONTENTS

2                                                                              **Page**

3   STATEMENT OF THE CASE                                                      1

4   STATEMENT OF FACTS                                                         2

5   STANDARD OF REVIEW                                                         7

6   ARGUMENT                                                                   9

7           **THE STATE APPELLATE COURT DID NOT UNREASONABLY
            APPLY CLEARLY ESTABLISHED FEDERAL LAW BY**
8           **REJECTING PETITIONER'S CLAIM THAT INSUFFICIENT
            EVIDENCE SUPPORTED HIS CONVICTIONS IN COUNTS 7**
9           **AND 8**                                                         9

10  CONCLUSION                                                                 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bains v. Cambra*
204 F.3d 964 (9th Cir. 2000)                                                                 8

*Brecht v. Abrahamson*
507 U.S. 619 (1993)                                                                           8

*Fry v. Pliler*
127 S. Ct. 2321 (2007)                                                                        8

*Himes v. Thompson*
336 F.3d 848 (9th Cir. 2003)                                                                  8

*Jackson v. Virginia*
443 U.S. 307 (1979)                                                                          11

*Juan H. v. Allen*
408 F.3d 1262 (9th Cir. 2005)                                                                11

*Lockyer v. Andrade*
538 U.S. 63 (2003)                                                                            8

*McMillan v. Gomez*
19 F.3d 465 (9th Cir. 1994)                                                                  11

*Williams v. Taylor*
529 U.S. 362 (2000)                                                                        7, 8

*Woodford v. Visciotti*
537 U.S. 19 (2002)                                                                            8


**Statutes**

California Penal Code
        § 261(a)(2)                                                                         1, 2
        § 273a(a)                                                                             2
        § 286(c)(2)                                                                           1
        § 288a, subd. (c)(2)                                                                1, 2
        § 667.5(c)                                                                            2
        § 667.61                                                                              2
        § 667.61(c)                                                                           2
        § 667.61(e)(5)                                                                        2
        § 1192.7(c)                                                                           2


United States Code, Title 28
        § 2254                                                                                2
        § 2254(d)(1) and 2                                                                    7

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

ii

**TABLE OF AUTHORITIES  (continued)**

**Page**

1

2
        § 2254(e)(1)                                                                                    8
3

4   **Other Authorities**

5   Antiterrorism and Effective Death Penalty Act of 1996                                 7, 11, 13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum Of Points And Authorities In Support Of Answer To Petition For Writ Of Habeas Corpus - *Topper v. Evans* - C 07-4543 JSW (PR)

iii