IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES E. TOPPER

Petitioner,

vs.

M.S. EVANS, Warden,

Respondent.

No. C 07-4543 JSW (PR)

ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS AND CERTIFICATE OF APPEALABILITY

**INTRODUCTION**

Petitioner, James Edward Topper, is a state prisoner currently incarcerated at Pleasant Valley State Prison in Ione, California. Petitioner filed this *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging violations of his constitutional rights because insufficient evidence supports his conviction on certain counts and imposition of upper-term sentences on certain counts due to his prior convictions violates his right to a jury trial.

This Court found that the petition, when liberally construed, stated a cognizable federal claim and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer. Petitioner filed an amended petition, and the court ordered Respondent to address the issues raised in Petitioner's amended petition. Respondent filed a supplemental answer. This *pro se* habeas petition is now before the Court for consideration on the

merits. For the reasons discussed below, the petition is denied.

**PROCEDURAL BACKGROUND**

On February 7, 2005, Petitioner was convicted by a jury of multiple sex offenses. On May 11, 2005, Petitioner was sentenced to a total indeterminate prison term of 70 years to life pursuant to California's "One Strike" law. Cal. Penal Code § 667.61. The California Court of Appeal affirmed Petitioner's conviction on June 26, 2006, and the California Supreme Court denied review on September 13, 2006. Petitioner filed the instant petition for habeas corpus on August 31, 2007.

**FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized in relevant part, as follows:

> S. and J.'s father died of a heart attack in April of 1998, when the family was living in Illinois. S. was 12. J. was 14. The girls' mother, Terri, did not react well to her husband's death. She was "absolutely devastated." She moved the family to Valdosta, Georgia, to be closer to her family. She would lock herself in her room and spend a lot of time "chatting" on the Internet. According to S., Terri "seemed really kind of to go off the deep end."
>
> Within two weeks Terri met defendant on the Internet. Defendant called himself "Jet 767" and claimed he was a pilot for Delta Airlines. He also claimed to own a plane, houses in West Virginia and Hawaii, and a red Jaguar. He passed himself off as a widower, but Terri was later to learn that defendant's wife was alive and living in Colorado. Terri communicated regularly with defendant and shared personal information. She told defendant about her husband's recent death and her two young daughters. She also told defendant that as a result of her husband's death she was receiving regular Social Security payments.
>
> In October 1998, Terri drove with her son Shawn to Fairmont, West Virginia, and met defendant at a McDonald's. Terri and defendant were married that weekend. Terri and Shawn returned to Valdosta, while defendant stayed in Fairmont. After Thanksgiving, Shawn and 12-year-old S. were sent to Fairmont to live with defendant. Terri and J. stayed behind in Valdosta.
>
> S. did not like living with defendant without her mother. Defendant was "a complete stranger to me." Within a couple of weeks after

her arrival, defendant began to molest her. Once, she fell asleep and awoke to find defendant's hands inside her shirt. On another occasion S. swallowed a button, and defendant made her lift up her shirt so he could "feel around on my chest to check to see if he could feel the button." On yet another occasion S. awoke to find defendant touching her on her chest and between her legs. S. was scared and didn't understand what was going on.

After Christmas J. was sent to join her sister and defendant in Fairmont. Terri stayed behind in Valdosta with defendant's daughter, Amanda. Defendant stopped molesting S., who was now 13, but started molesting 15-year-old J. One night when it was snowing defendant asked J. if she wanted to cuddle on the couch, telling her it would be warmer. Defendant began touching J. in the abdomen and the vaginal area, then penetrated her vagina with his hand. Then defendant penetrated J.'s vagina with his penis. J. pretended to be asleep, hoping that defendant would stop.

Terri moved to Fairmont in February 1999 and rejoined the family. Defendant sexually assaulted J. between 10 and 20 times over the next several months. The assaults included intercourse and oral copulation.

On one occasion, J. told defendant she did not like what he was doing to her. Defendant became angry, grabbed her hand, placed it on his penis and pushed her head toward her hand. J. understood that defendant wanted her to orally copulate him. She did, but did not want to do so. Defendant told J. not to tell Terri about the sexual assaults. He threatened to send her to a reform school, which would jeopardize J.'s hopes to join the military. Defendant's reform school threat weighed on J.'s mind and affected her judgment and her "thoughts about things [defendant] was doing to" her.

As J. got to know defendant while living with him in Fairmont, she concluded that he "learned [the] habits and weaknesses" of Terri, J., S., and Shawn. He "was very quick to judge and had a quick temper." Meanwhile Terri began to have misgivings about defendant. "I came to realize that he was not the person that he led me to believe he was. If you didn't do what he wanted you to do, you suffered. He used threats, manipulation and [was] controlling."

Defendant called S. and J. names and belittled them, and forced them to stand holding a dime against a wall with their nose. He treated the two girls "like they were dogs." Terri tried to get defendant to stop the mistreatment, but to no avail: defendant said "when he spoke we had to listen and if we didn't we wouldn't like him very much." He made Terri open a bank account for the Social Security payments she received for her husband's death, and defendant took control of the account.

In June 1999, the family moved to Parkersburg, West Virginia.

Defendant continued to sexually molest S. and J. Defendant told S. not to tell anyone, or she would be sent away. That scared S. because “I had never been away from my family before except for staying at people's houses.... I had already lost my dad. I didn't want to lose the rest of my family as well.” J. found that resisting defendant was not useful-defendant would become angry and mean. “It was always easier to just go along than put up a fight and argue.”

In August, J. told Terri about the molestations. Terri confronted defendant, who became angry and denied molesting J. Defendant told Terri he would take J. for a ride and make a tape recording of her denying any sexual assault. Defendant ordered J. to pack all her clothes in garbage bags, leading her to believe she was being taken away “for good,” and took her on a five-hour drive.

During the drive, defendant asked J. what she was trying to accomplish. He accused her of lying and told her she would be “locked up” in a reform school and be unable to join the military. She begged him “not to take me,” and defendant asked what was in it for him. J. took this as a “signal to me ... that he wanted ... sexual favors in exchange for ... me to go home.” She was crying, and was afraid of being put in a mental institution and excluded from military service. She orally copulated defendant, again without wanting to.

Back at the house, defendant played a tape recording for Terri. She heard J. begging defendant not to send her away, and promising to do anything for him-including oral copulation and having sex on the hood of the car. J. later told Terri that she had lied about defendant's molesting her. But defendant continued to sexually molest J.

In January 2000, the family moved to Scottsdale, Arizona. Defendant continued to molest J. Defendant continued to molest S., escalating to intercourse and oral copulation. Defendant became enraged when S. kissed the family puppy. He pulled her by the hair and threw her into a wall. He slammed Shawn to the floor when he tried to intervene. Defendant also tried to sever the relationship between S. and Terri. Defendant and Terri had a fight, which culminated in defendant telling Terri that “if you fuck with me, there's not a safe place on earth for you.”

In January 2001, the family moved to Mesa, Arizona. In April, J. joined the Army. Defendant continued to rape S. and force her to engage in oral copulation. He would threaten to send her away if she told anyone. S. was scared and “whether I fought or didn't fight, he was going to get his way. So it was just easier for me to just let it happen and get it over with.” S. knew that defendant had sent Shawn away to a reform school in Mexico because he refused to paint the garage door.

In October 2001, the family moved to Logandale, Nevada. J. was still in the Army. Defendant continued to rape S. and force her to orally copulate him. He also forced her to engage in anal sex. When she tried to pull away, defendant forcibly pulled her back.

*The Charged Offenses*

In April 2002, defendant came under the criminal jurisdiction of California when the family moved to Livermore. J. had rejoined the family after a medical discharge from the Army. S. was 16 and a freshman in high school.

Based on conduct occurring between April 1, 2002, and February 24, 2003, defendant was convicted of 14 felony sex offenses-12 involving S. (Counts 1-6 and 9-14) and two involving J. (Counts 7 and 8). We summarize the facts underlying those convictions.

*S.*

S. testified that defendant exercised complete control over her. He would tell her “where to go, what to do, what to say at times. I didn't have control over anything I wanted.” S. had to come home for lunch during the school day, and defendant took her to the premises of his sign business when the school day ended. S. could not go out on weekends, talk on the phone, or have friends over. She rarely used the computer. If she disobeyed defendant, he would become angry and “lash out” at her. S. was always afraid defendant would hurt her or send her away, or hurt Terri-defendant had thrown a lit cigarette in Terri's face while the family lived in Parkersburg.

*Count 3-forcible oral copulation (§ 288a, subd. (c)(2))*
*Count 4-forcible rape (§ 261, subd. (a)(2))*

Before she left for high school in the mornings, S. would usually take defendant his coffee. He occasionally would ask her for a “quickie before school.” S. testified about one specific occasion, in defendant's bedroom, where defendant forcibly orally copulated her and then raped her. S. submitted because she was scared of defendant and was afraid he would injure her or send her away, separating her from Terri.

*Count 1-forcible oral copulation (§ 288a, subd. (c)(2))*
*Count 2-forcible rape (§ 261, subd. (a)(2))*
*Counts 9 & 10-forcible oral copulation (§ 288a, subd. (c)(2))*
*Count 11-forcible rape (§ 261, subd. (a)(2))*

Defendant raped and forcibly orally copulated S. during her driving lessons. He apparently would first force the copulation and then commit rape. S. testified to two specific occasions of forcible sex in defendant's car, but said forcible sex happened “a lot.” She was scared and afraid of being sent away. She felt “like a robot, like his

little toy." She endured the forcible sex because she "couldn't bear to be separated" from her mother.

On another occasion, defendant took S. to the premises of a friend's business, where he forcibly orally copulated and then raped her.

S. testified that while the family lived in Livermore defendant raped her or forced her to orally copulate him "one to two times a day." S. was "robotic ... It was like programmed, I knew what to do. Then when he would be raping me, it was just like I was just a numb statue, like I was paralyzed. I wouldn't move ... I would just lay there."

Defendant would complain about S.'s failure to show emotion during the forcible sex acts: "He would tell me, what's wrong with me, are you a lesbian, why aren't you acting like you're enjoying this." If she wasn't responsive defendant would pinch her on the arm and hit her on the legs, enough to hurt but not enough to leave marks.

*Counts 12 & 13-forcible oral copulation (§ 288a, subd. (c)(2))*
*Count 14-forcible sodomy (§ 286, subd. (c)(2))*

Defendant forced S. to submit to sex acts more than 20 times on the premises of his sign business. S. testified to one specific occasion where defendant forced S. to orally copulate him, raped her, and forcibly sodomized her in the back of a van parked in the garage of the premises.

*S. and J.*

In addition to the abuse of S. summarized above, defendant continued to sexually molest J. after she returned from the Army and the family lived in Livermore. This included uncharged acts of sexual intercourse and forcible oral copulation. Defendant was convicted of forcible oral copulation and forcible rape of both S. and J., based on the incident we now describe.

*Count 5-forcible oral copulation (§ 288a, subd. (c)(2))(S.)*
*Count 6-forcible rape (§ 261, subd. (a)(2))(S.)*
*Count 7-forcible oral copulation (§ 288a, subd. (c)(2))(J.)*
*Count 8-forcible rape (§ 261, subd. (a)(2))(J.)*

On a day when Terri was out of town, defendant told S. that J. had seen them engaging in sex acts, and that defendant and S. had to trick J. into performing a sex act with the two of them "so she wouldn't be able to tell [Terri] what was going on." Defendant told S. to "do what you do," which S. took to mean that she would be forced to perform oral copulation on defendant and then be raped.

Defendant then went to J. and told her that S. had seen them engaging in sexual activity, and that "the only way to keep [S.]

> from saying something to [Terri] was to get all of us, the three of us total involved."
>
> Defendant called S. and J. to his bedroom and had them disrobe and get into bed. The three laughed and wrestled playfully, but then "it all of a sudden got really serious." Defendant laid back on the bed and told J. to sit next to him. Pursuant to the earlier command of "do what you do," S. began to perform oral sex on defendant. Defendant told J. to lick his nipples, which she did. Defendant then placed S. on her knees and raped her. During the rape defendant had J. stand behind him and lick his testicles. Defendant put S. on her back and raped her again. At some point defendant forced J. to orally copulate him.
>
> Defendant ordered S. and J. to get on all fours at the edge of the bed. The two girls knelt side-by-side. Defendant raped J., who stared down at the bedclothes and showed no emotion. S. touched her hand but she did not respond. J. "just wanted [the sex acts] to stop." Defendant then raped S.
>
> Defendant sent J. to the store for food. After she left, defendant told S. that J. "wasn't good enough, so let me finish off with you." Defendant raped S. again.
>
> *Aftermath*
>
> After admitting the sexual abuse to school counselor, S. was removed from defendant's home. When police investigated, J. denied she had been sexually molested by defendant. But defendant continued to sexually abuse her. Eventually J. established a romantic relationship with a man she met on the Internet, and left to live with him in Australia without defendant's or Terri's knowledge. She then felt safe enough to reveal the sexual abuse to police.
>
> Defendant's response to J.'s revelation was this e-mail:
>
> "Teri [ sic ] has only one daughter. You aren't it. She is putting your ass in jail. You will find out she wasn't joking shortly. She hates your fucking guts. You think you can leave Australia and get back in in three months. Doesn't even matter if you're married to the fucking loser, you won't get back in. Your ex-Mom took care of that. You are dead. Don't ever contact us again. You have no family, not Teri [ sic ], not Amanda, not Sean [ sic ]. You are dead to all of us. Do not contact us again. Whore. She has had her phone numbers changed so you-she's had her phone number changed so you doesn't [ sic ] hear your disgusting voice. She has blocked you from her mailbox. Don't make this mistake again. Ever. Ever. Ever, you disgusting piece of shit."
>
> Following defendant's conviction of the 14 felony sex offenses, the trial court sentenced him to 70 years to life. The life sentence arises

> from the One Strike law because defendant committed the sex offenses against two victims. (§ 667.61, subd. (e)(5).)

*People v. Topper*, No. A110478, 2006 WL 1742740 (Cal. App. 1st Dist., June 26, 2006), at *1-5.

**STANDARD OF REVIEW**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for habeas relief "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted unless the state court's adjudication of any claim on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-12 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's

claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See*, e.g., *Lockhart v. Terhune*, 250 F.3d 1223, 1230 (9th Cir. 2001); *Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002)(state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).

## DISCUSSION

In this petition for a writ of habeas corpus, Petitioner alleges that his due process rights under the Fourteenth Amendment were violated by his conviction for Counts 7 and 8 of sexual assault of victim Jennifer due to insufficient evidence of duress. Further, Petitioner alleges that his confinement is unconstitutional based on the imposition of upper term sentences on several of the counts in violation of the Supreme Court decisions in *Cunningham v. California*, 549 U.S. 270 (2007) and *Blakely v. Washington*, 542 U.S. 296 (2004).

### I. Sufficiency of Evidence.

Petitioner challenges the sufficiency of evidence to sustain his conviction for forcible oral copulation (Count 7) and forcible rape (Count 8) of victim Jennifer. Specifically, Petitioner alleges that the prosecution did not establish the necessary element of "duress" during the trial and that the prosecution's failure to establish Jennifer's motive for keeping the acts secret precluded any finding of duress, a necessary element of the sexual assault charges.

#### A. Legal Standard

The Due Process Clause "protects the accused against conviction except

upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In reviewing a habeas petition for a prisoner who alleges insufficiency of evidence to support his conviction, the federal court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune,* 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Where behavior is consistent with both guilt and innocence, the burden is on the State to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt. *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007). However, the prosecution need not affirmatively rule out every hypothesis except that of guilt. *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326);

*see, e.g., Davis v. Woodford*, 384 F.3d 628, 639-41 (9th Cir. 2004) (finding sufficient evidence of premeditation). The existence of some small doubt based on an unsupported yet unrebutted hypothesis of innocence therefore is not sufficient to invalidate an otherwise legitimate conviction. *See Taylor v. Stainer*, 31 F.3d 907, 910 (9th Cir. 1994) (three hypotheses regarding petitioner's fingerprints which government failed to rebut unsupported by evidence and therefore insufficient to invalidate conviction).

Furthermore, under AEDPA, a federal habeas court has an additional layer of deference in its application of *Jackson*. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *In re Winship* to the case at hand. *Id.* at 1275.

**B. Analysis**

The relevant question is whether there was sufficient evidence of duress for a rational trier of fact to find Petitioner guilty of the charged offenses in Counts 7 and 8 under Cal. Penal Code § 261(a)(2) and 288 (c)(2). *Jackson*, 443 U.S. at 319. The state appellate court issued a reasoned opinion in which the court upheld the convictions, finding sufficient evidence to support the jury’s findings of duress under California law on the two counts. *People v. Topper,* 2006 WL 1742740 at *6-7. The California Court of Appeal laid out an extensive history of sexual abuse of victim Jennifer, starting when she was 15 years old, in order to establish the circumstances under which the evidence is considered to make a finding of duress under California law. *Id.* at *1, n.1. Reviewing the evidence in the light most favorable to the prosecution, this Court must determine whether the state court unreasonably applied *Jackson* and *In re Winship* in its determination that there was sufficient evidence to support

Topper's convictions on these counts. *Juan H.*, 408 F.3d at 1275.

Defendant alleges that his conviction of forcible oral copulation and forcible sexual intercourse on victim Jennifer was based on insufficient evidence. Defendant first points out that several of the threats that were relied upon were made to Jennifer before he and the family moved to California. Furthermore, he alleges that the reason that Jennifer wished to keep the sexual acts a secret from her mother remained unanswered throughout the course of the trial, and this fact supports his contention that there is no evidence that he ever used duress in order to forcibly commit oral copulation and sexual intercourse against her. Respondent argues that the state court correctly applied clearly established federal law in the case in its determination that there was duress and that a reasonable trier of fact could have found Petitioner guilty.

Petitioner's argument that there was insufficient evidence to support the finding of duress by the jury is without merit. Throughout the trial, it was established that Petitioner had both psychological and physical control over Jennifer, Jennifer's sister and Jennifer's mother. *See e.g.* Resp. Exhibit B, Reporter's Transcript (hereinafter "RT) at 274, 285, 289-90. The prosecution offered evidence of Jennifer's vulnerable emotional state when Petitioner came into her life as her stepfather after the death of Jennifer's father. RT 271-72, 392-402. Petitioner began to sexually abuse Jennifer when Jennifer was fifteen years old, and used both physical and verbal threats to keep Jennifer under control. *Id.* In sum, Jennifer testified that Petitioner had forced her to perform sexual intercourse and oral copulation between 10 and 20 times when she was underage, and the sexual assaults continued when she was over the age of 18. RT at 88, 404.

The prosecution also underscored the continuous threats that Jennifer

faced from Petitioner, including threats of being thrown out of the house that she shared with her mother, and being unable to pursue her goal of joining the military if her abuse was revealed. RT 408-417. Although the criminal acts described in Counts 7 and 8 were committed when Jennifer was no longer a minor, the lengthy history of Petitioner's physical and emotional abuse of Jennifer is enough for a reasonable trier of fact to find duress.

During trial, other examples of Petitioner's psychological control over Jennifer and the rest of her family were presented as evidence of Petitioner's emotional hold over Jennifer and the rest of her family. Jennifer's younger brother was sent away to reform school after he refused to paint the family garage. RT at 291-92. Petitioner also threatened to send Jennifer's sister, Sandee, away to reform school. RT at 417. When Jennifer told her mother about the abuse that she was going through, Petitioner told Jennifer to pack up her belongings and took her on a car ride during which he recorded a conversation where he coerced Jennifer into agreeing that she would be cooperative out of intimidation. *Id*. Petitioner also allegedly beat Jennifer's younger brother and at one point dragged Jennifer's sister down a flight of stairs when he was unhappy, indicating a propensity for violence and adding to Jennifer's fear of Petitioner. RT at 291-292, 463.

After reviewing the trial record, the state appellate court found that the jury was entitled to consider the element of duress "through the history of past control and coercion" and that the jury "could reasonably conclude that defendant exerted psychological coercion to get J. to submit" to the rape as well as the charge of oral copulation. *People v. Topper*, 2006 WL 1742740 at *7. The court noted that Defendant's conduct in California alone provided ample support for the finding of duress. *Id.*

A review of the record shows that the appellate court reasonably applied the rules in *Jackson* and *In re Winship* here. A reasonable trier of fact could easily conclude with the evidence presented that Petitioner was guilty of the charged offense. *Juan H.*, 408 F.3d at 1275. The state court's findings were not contrary to or an unreasonable application of established federal law, therefore Petitioner's claim must be denied.

II. ***Blakely* and *Cunningham* Claim**

Petitioner also challenges his conviction on the grounds that his sentence is in violation of the Supreme Court decisions in *Blakely* and *Cunningham* because an upper term limit was imposed by the trial court on several counts based on his prior convictions. *Blakely v. Washington*, 542 U.S. 296 (2004); *Cunningham v. California*, 549 U.S. 270 (2007).

In the amended petition, Petitioner argues that since his prior convictions upon which the trial court relied for his upper term sentence were for nonviolent crimes such as writing a bad check, making a false statement to a bank and failure to pay a motel bill, they should not have been used in aggravation, but should have been considered mitigating factors when determining his sentence.

**A. Legal Standard**

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial by jury. U.S. Const. amend. VI. This right to a jury trial has been made applicable to state criminal proceedings via the Fourteenth Amendment's Due Process Clause. *Duncan v. Louisiana*, 391 U.S. 145, 149-50 (1968). The Supreme Court's Sixth Amendment jurisprudence was significantly expanded by *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and its progeny, which extended a defendant's right to trial by jury to the fact finding used to make enhanced sentencing determinations as well as the actual elements

of the crime. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 488-90 (2000). The "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather is the maximum he or she could impose without any additional findings. *Blakely*, 542 U.S. at 303-04.

In *Cunningham v. California*, 549 U.S. 270 (2007), the Court held that California's determinate sentencing law ("DSL") violated the Sixth Amendment because it allowed the sentencing court to impose an elevated sentence based on aggravating facts that it found to exist by a preponderance of the evidence. *Id.* at 274, 291-92. The sentencing court was directed under the DSL to start with a "middle term" and then move to an "upper term" only if it found aggravating factual circumstances beyond the elements of the charged offense. *Id.* at 278. Concluding that the middle term was the relevant statutory maximum, and noting that aggravating facts were found by a judge and not the jury, the Supreme Court held that the California sentencing law violated the rule set out in *Apprendi*. *Id.* at 293-94. Although the DSL gave judges broad discretion to identify aggravating factors, this discretion did not make the upper term the statutory maximum because the jury verdict alone did not authorize the sentence and judges did not have the discretion to choose the upper term unless it was justified by additional facts. *Id.* at 288-89. *Cunningham* did not announce a new rule and thus applies retroactively on collateral review. *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008)

*Apprendi*'s "prior conviction" exception is limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt. *United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001). Recidivism and prior convictions increasing the maximum penalty need not be charged to comport with the constitutional right to fair notice because they are not considered an element of the offense charged. *See Almendarez-Torres v. United States*, 523 U.S. 224, 243-44 (1998); *United States v. Pacheco-Zepeda*, 234 F.3d 411, 414-15 (9th Cir. 2001), *cert. denied*, 532 U.S. 966 (2001) (holding that *Almendarez-Torres* remains good law after *Apprendi* and provides that prior convictions, whether or not admitted by the defendant on the record, are sentencing factors rather than elements of the crime).

Prior convictions resulting from adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof do not fall within *Apprendi*'s "prior conviction" exception; therefore, they must be submitted to a jury and proved beyond a reasonable doubt before they can be used to increase the penalty for a crime beyond the prescribed statutory maximum. *See Tighe*, 266 F..3d at 1194-95 (juvenile adjudications that do not afford the right to a jury trial and beyond-a-reasonable-doubt burden of proof do not fall within *Apprendi*'s "prior conviction" exception). *Tighe*'s holding does not represent clearly established Supreme Court precedent, however. *See Boyd v. Newland*, 467 F.3d 1139, 1152 (9th Cir. 2006) (in the face of other-circuit authority that is directly contrary to *Tighe*, and in the absence of explicit direction from the Supreme Court, it cannot be said that California courts' use of a juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent).

The Ninth Circuit has previously found that a sentencing court's

determination that the current offense was committed while the defendant was on probation does not come within *Apprendi*'s "prior offense" exception. *Butler*, 528 F.3d at 641, but also has concluded that the *Butler* holding is not clearly established Supreme Court law, so cannot be the basis for federal habeas relief, *Kessee v. Mendoza-Powers*, 574 F.3d 675, 679 (9th Cir. 2009) (holding that the state appellate court's finding that Petitioner had committed crimes while on probation fell within the "prior conviction" exception does not contravene AEDPA standards.) As *Kessee* states,

> Because the Supreme Court has not given explicit direction and because the state court's interpretation is consistent with many other state courts' interpretations, we cannot hold that the state court's interpretation was contrary to, or an unreasonable application of established Supreme Court precedent.

Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error; therefore, it is subject to harmless-error analysis. *Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006). Any such error would be subject to review for harmlessness under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

**B. Analysis**

Petitioner's argues that his sentence is invalid because the court used evidence of his prior convictions to impose an upper term on several counts in rendering his sentence. Petitioner argues that this was not legally valid because his prior convictions were for nonviolent crimes, which should have been considered in mitigation rather than as aggravating factors.

In rendering sentence, the trial court found that Petitioner was eligible for the upper term due to aggravating terms set forth in California Rule of Court 4.421, under subsections, (a)(3). (a)(11), (b)(2) and (b)(3). RT at 626. Of these aggravating factors, (b)(2) and (b)(3), which relate to Petitioner's prior

convictions, are considered here.

The trial court's findings regarding Petitioner's prior convictions falls squarely within the prior conviction exception to *Apprendi*. *See Apprendi*, 530 U.S. at 488-90. Since the "finding of a single aggravating factor is sufficient to render a defendant eligible for the upper term" this court only needs to consider whether one of the factors that the trial court relied on in sentencing Petitioner could have supported the upper term. *See Butler*, 528 F.3d at 641.

Petitioner does not allege that his prior convictions and prior prison sentence were the result of proceedings that did not afford him the right to a jury trial and proof beyond a reasonable doubt. Therefore, the trial court's imposition of the upper term based on Petitioner's prior convictions falls within the *Apprendi* exception. *Tighe*, 266 F.3d at 1194. There is no requirement under *Apprendi* and its progeny that the prior convictions were for certain types of crimes, such as violent crimes, as Petitioner apparently argues. Therefore, the petition for writ of habeas corpus on this claim must be denied here.

Petitioner's separate contention that the trial court's sentence of consecutive terms on his convictions violates the rule in *Blakely* is also without merit. The application of *Apprendi* and its progeny is limited to sentencing decisions historically reserved for the jury. *See Oregon v. Ice*, 129 S. Ct. 711, 717-18 (2009) (declining to extend *Apprendi* to a state's sentencing system that gives judges discretion to determine facts allowing imposition of consecutive or concurrent sentences for multiple offenses, noting that determination of consecutive versus concurrent sentences is traditionally not within the function of the jury). Therefore, this claim also fails.

**CERTIFICATE OF APPEALABILITY**

The federal rules governing habeas cases brought by state prisoners have

recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate must indicate which issues satisfy this standard. See id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000).

For the reasons set out in the discussion of the merits, above, jurists of reason would not find the result debatable. A certificate of appealability will be denied.

**CONCLUSION**

The state court's denial of Petitioner's habeas petition is not contrary to or an unreasonable application of established federal law determined by the Supreme Court. Therefore, Petitioner's claims are DENIED and the Court declines to grant a certificate of appealability. The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: August 30, 2010

JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JAMES E TOPPER,

Plaintiff,

v.

M S EVANS et al,

Defendant.
_______________________________/

Case Number: CV07-04543 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on August 30, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

James E. Topper
V79602
P.O. Box 8500
Coalinga, CA 90029

Dated: August 30, 2010

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk